IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

13 CIV 5523

| | |
|---|---|
| **GEOFFREY H. COLL,** | |
| **Plaintiff,** | Civ. No. _____ |
| v. | |
| **BARCLAYS BANK PLC,** | **COMPLAINT** |
| **Defendant.** | **(Jury Trial Demanded)** |

Plaintiff, on behalf of himself represented *pro se*, as and for his Complaint against Barclays Bank PLC ("Barclays"), hereby states and alleges as follows:

## NATURE OF THE ACTION

1.     Plaintiff, a former equity partner of the now bankrupt New York law firm Dewey & LeBoeuf LLP ("Dewey"), brings this action seeking a judicial declaration that no valid or enforceable contract exists between the parties arising from an April 2, 2008 Letter ("Letter Agreement" attached as Exhibit A), and/or seeking rescission of the Letter Agreement, related to $189,000 provided by Barclays to Dewey to satisfy a partial capital contribution that Plaintiff never owed to Dewey in that amount.

2.     First, the Letter Agreement should be declared null and void *ab initio* because the Partnership Undertaking that is an integral part of the Letter Agreement was never fully executed by two Dewey partners as required by the Letter Agreement's own express terms governing acceptance.

3.      Second, the Letter Agreement should be rescinded for lack of consideration because no partial capital contribution of $189,000 was ever owed by Plaintiff to Dewey in exchange for allegedly being liable to Barclays for repayment of the capital loan.

4.      Third, the Letter Agreement should be rescinded because of mutual mistake because both Plaintiff and Barclays were mistaken about the same material fact – that $189,000 was ever due and owing by Plaintiff to Dewey as a partial capital contribution.

5.      Fourth, in the alternative, should the Court find that the Letter Agreement is a valid and enforceable contract between the parties and should not be rescinded, Plaintiff seeks a declaration that under the express and unambiguous repayment provisions of Section 5.3(c) of the Letter Agreement, the loan is not due and payable by Plaintiff to Barclays until "120 months after the date upon which [Plaintiff] cease[d] to practice as a partner with the Firm [Dewey]," or on or about May 4, 2022, such date being 120 months after Plaintiff ceased to practice as a Dewey partner on May 4, 2012.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff is a natural person who resides in Bethesda, Maryland.  Plaintiff is licensed to practice law in the states of New York, New Jersey and the District of Columbia. Plaintiff is also a member in good standing of the bar of this Court since November 20, 1990. Plaintiff became an equity partner of LeBoeuf, Lamb Greene & MacRae, LLP ("LeBoeuf"), on January 1, 2005, which firm later merged with Dewey Ballantine LLP in October 2007, to form Dewey & LeBoeuf LLP ("Dewey").  Plaintiff was an equity partner at the merged firm Dewey from its inception until resigning from the Dewey partnership on May 4, 2012, to join another law firm.

7.     Barclays is a public limited company incorporated in England and Wales, and is engaged in the business of banking.   Barclays, either directly or through its subsidiaries, conducts substantial business in the State of New York.

8.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334, because the case arises in or is related to Dewey's bankruptcy.

9.     The Court also has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district and, alternatively, because Barclays is subject to personal jurisdiction in this judicial district because it engages in substantial business in New York.

## THE LEBOEUF CAPITAL ACCOUNT PROGRAM

11.     Plaintiff became a partner of LeBoeuf on January 1, 2005.  At that time, Plaintiff was advised by LeBoeuf's then Chief Financial Officer, Joel Sanders, that upon becoming a partner of the firm, Plaintiff would ultimately be required to contribute as capital to the firm an amount equal to thirty-six percent (36%) of Plaintiff's gross annual earnings, to be deducted from Plaintiff's gross annual earnings at a rate of approximately six percent (6%) per year for the first six years that Plaintiff was an equity partner.  Each month as a LeBoeuf partner, Plaintiff received a gross payment of $25,000 (the "draw"), less deductions for certain state taxes, retirement programs, and benefits, as well as a monthly deduction for a portion of that year's capital contribution that was deposited in Plaintiff's capital account maintained by the firm.  In addition, from time to time there were distributions of net profits to partners above the draw over the course of the year.

12.     By the end of 2007, LeBoeuf had deducted capital contribution amounts each month from Plaintiff's monthly draw to bring the total amount contributed by Plaintiff to Plaintiff's Capital Account at LeBoeuf to approximately $63,000.

## THE BARCLAYS CAPITAL LOAN PROGRAM

13.     On about January or February of 2008 in the initial months following the Dewey merger, Plaintiff's gross annual target compensation for the year 2008 was increased by the newly formed Dewey Executive Committee to $700,000, an annual target gross compensation amount that would only be paid if the firm met its budget for 2008.  This increase was merited based on Plaintiff's productivity to the firm.

14.     In a Memorandum dated March 6, 2008 (the "Memo"), Dewey's CFO Joel Sanders and the rest of Dewey's Executive Committee advised Plaintiff, and other equity partners of the newly merged firm, of a new capital loan program, arranged by Dewey, being offered by Barclays (the "Barclays Program") as a new method for equity partners to fund their capital contributions.

15.     The Memo began:  "In order to fund the Firm's working capital needs the Executive Committee has approved a capital loan program sponsored by Barclays bank."

16.     The Memo further stated and explained:  "There will be no financial impact to you with respect to this loan, until such time as your capital is actually due to the firm."

17.     Plaintiff responded to the Memo by speaking to Mr. Sanders by telephone on or about March 6, 2008, the date Plaintiff received the Memo.  Mr. Sanders informed Plaintiff that the Dewey Executive Committee of the newly merged firm had determined that it would no longer honor the prior agreement made by LeBoeuf to Plaintiff of permitting the remainder of Plaintiff's capital contribution to be deducted from Plaintiff's gross annual salary  over the next

three years, until the required total capital contribution of thirty-six percent (36%) of Plaintiff's actual gross annual compensation was reached.  Instead, the Dewey Executive Committee had determined that all former LeBoeuf partners in Plaintiff's position whom had not yet contributed the full required thirty-six percent (36%) of their capital requirement would now be required to borrow any remaining capital amounts due by participating in the Barclay's Program.

18.     During this same telephone conversation on or about March 6, 2008, Mr. Sanders also informed Plaintiff that out of respect to LeBoeuf's original promise to permit Plaintiff's capital contribution to be paid into the firm over six years, Plaintiff would not be required to pay any interest on capital amounts due in connection with any capital loan made to Plaintiff as part of the Barclays program.  Instead, Dewey would pay all interest amounts due in connection with any capital loan made to Plaintiff through the Barclays program.

19.     In addition, during this same telephone conversation on or about March 6, 2008, Mr. Sanders also repeated to Plaintiff the same assurance he had previously made in the Memo, that "there will be no financial impact to you with respect to this loan, until such time as your capital is actually due to the firm."  Mr. Sanders explained to Plaintiff that he was being asked to participate in the Barclays Program by signing loan documentation for an amount that would equal thirty-six percent (36%) of Plaintiff's 2008 target compensation of $700,000, minus any amounts already held in Plaintiff's LeBoeuf Capital Account that had transferred to Dewey as part of the merger.  Mr. Sanders also assured Plaintiff during this same conversation that if his compensation for 2008 did not reach $700,000, then any capital required to be drawn down by Dewey from any loan made available to Plaintiff through the Barclays Program would be reduced to reflect no more than thirty-six percent (36%) of Plaintiff's actual gross compensation for 2008.

20.     Mr. Sanders also explained during this same telephone conversation on or about March 6, 2008 that as an integral part of Plaintiffs' loan agreement with Barclays, Barclays would receive an undertaking from Dewey providing that any funds received from Barclays by Dewey would be paid back to Barclays out of Plaintiff's capital account at Dewey first on the same time frame provided for under Section X of Dewey's partnership agreement between all the partners of the newly merged firm ("Partnership Agreement").     Section X of Dewey's Partnership Agreement provided that the sums standing to the credit of a partner's Capital Account with the firm would be repayable within three years following the partner ceasing to be a partner in the Firm, whether by reason of death, retirement or otherwise.

## THE BARCLAYS CAPITAL LOAN PROGRAM DOCUMENTATION

21.     On or about April 11, 2008, Plaintiff received through inter-office correspondence from Mr. Sanders unexecuted documentation for the Barclays Program related to a capital loan of $189,000.  The documentation was incorrectly addressed to Plaintiff at the New York office of Dewey, notwithstanding the fact that Plaintiff had moved to Dewey's Washington, DC, office approximately three years earlier.  The documentation received included an executed April 2, 2008 letter incorrectly addressed to Plaintiff at Dewey's New York office signed by an Iain Worsley, "Relationship Director," on Barclays Letterhead bearing a London address, a Schedule A to the letter comprised of an undated and unexecuted "Instruction Letter" from Plaintiff to Dewey, and a Schedule B to the letter comprised of an undated and unexecuted "Partnership Undertaking" from Dewey to Barclays requiring the signatures of at least two Dewey partners "[b]oth authorized on behalf of the Firm in accordance with the Bank Mandate."

22.     After initially reviewing the loan documentation, Plaintiff again telephoned Mr. Mr. Sanders.  During this call on or about April 11, 2008, Mr. Sanders gave Plaintiff the same

assurance he had previously made in the Memo, that "there will be no financial impact to you with respect to this loan, until such time as your capital is actually due to the firm." Mr. Sanders also repeated that any additional capital contribution owed by Plaintiff to Dewey would be determined at the end of 2008 based on thirty-six percent (36%) of Plaintiff's actual gross annual compensation in 2008, not based on Plaintiff's 2008 target compensation of $700,000 which was still very uncertain.

23.     Mr. Sanders requested that Plaintiff sign the loan documentation being provided for a $189,000 loan with the understanding that no one at Dewey would complete the required loan documentation or request any funds from Barclays in Plaintiff's name, including that no partner at Dewey would complete the unexecuted Schedule B Partnership Undertaking from Dewey to Barclays requiring the signature of two Dewey partners, until Plaintiff's actual 2008 annual gross compensation was determined at the end of 2008 based on the actual performance of the newly merged firm.

24.     To underscore that two Dewey partners were required to sign the Partnership Undertaking before any funds would be drawn by Dewey in Plaintiff's name under the Barclays Program, the terms and conditions section of the April 2, 2008 Letter Agreement included a Clause 13 entitled "Acceptance," that stated (emphasis added): "Acceptance by [Plaintiff] of the Loan on the terms and conditions stated herein will be signified by the [Plaintiff] signing the attached copy of this letter and returning it, together with the Instruction Letter, duly executed, *and the Undertaking, duly signed by authorized partners of [Dewey],* to the Bank.

25.     The terms and conditions section in the April 2, 2008 Letter Agreement also included a Clause 5 entitled "Repayment." Clause 5.1 of this Repayment provision provided that "[t]he Borrower shall choose, by manuscript deleting and signing the non-appropriate Clause 5.2

or Clause 5.3 whether to repay the loan on an Amortising Basis or on a Bullet Repayment Basis." In response, as reflected on the attached Exhibit A, on or about April 11, 2008, Plaintiff deleted Clause 5.2 by crossing through the section with an "X" and signing Plaintiff's initials to the now non-appropriate Clause 5.2.

      26.    The remaining Bullet Repayment Clause 5.3 of the April 2, 2008 letter that was not deleted by Plaintiff provided, in relevant part (emphasis added):

> (c)  In the event of: (a) the Borrower ceasing to practice as a partner with the Firm . . . ; and (b) the provisions of Article X of the Firm's Partnership Agreement preventing immediate repayment of the Borrower's partnership capital, the Loan shall become due and payable at the times and in such amounts as the Borrower's capital account is repaid in accordance with the Firm's partnership Agreement (as in effect at date of this agreement) *and in any event no later than the date falling 120 months after the date upon which the Borrower ceases to practice as a partner with the Firm.*

      27.    On or about April 11, 2008, after first speaking with Mr. Sanders by telephone as detailed above and after making the changes detailed above in Clause 5 of the Repayment provisions of the Letter Agreement, Plaintiff then signed the Letter Agreement before a witness in the DC office of Dewey and returned the original to Mr. Sanders by inter office mail.

      28.    Schedule A to the Letter Agreement was an unexecuted "INSTRUCTION LETTER" from Plaintiff to Dewey confirming that Plaintiff had applied to Barclays "to borrow for the purpose of injecting capital in the Firm" with the express condition that:

> "In order for the Bank to authorize such borrowings the Bank requires that the Firm issue a Letter of Undertaking under which, *inter alia*, the Firm will undertake to pay any funds withdrawn at any time (and from time to time) on or after the date hereof from my partnership capital account with the Firm (the "Capital Account") directly to the Bank for application in or towards repayment of such borrowings to the extent necessary . . .

      29.    As required, on or about April 11, 2008, Plaintiff also executed the Schedule A Instruction Letter to the Letter Agreement, and also returned the original to Mr. Sanders by the same inter-office mail.

30.     Schedule B to the Letter Agreement was an unexecuted copy of the "Partnership Undertaking" referred to in the Instruction Letter from Plaintiff to Dewey referred to above in paragraph 28.  The Schedule B Partnership Undertaking granted Barclays a priority security interest in Plaintiff's Capital Account at Dewey that required Dewey to apply the balance of Plaintiff's Capital Account to satisfy any indebtedness remaining outstanding under the Loan with the Bank, before exercising any other rights of set-off over Plaintiff's Capital Account, before paying any amount to the Plaintiff, and before reducing the Plaintiff's Capital Account for any reason, and other similar provisions.

31.     The Schedule B Partnership Undertaking was not executed nor dated when received by Plaintiff from Mr. Sanders on or about April 11, 2013 as a schedule to the April 2, 2013 Letter Agreement.  Plaintiff returned to Mr. Sanders the unsigned and undated Schedule B Partnership Undertaking by the same inter-office mail as the newly executed Letter Agreement and Schedule A Instruction Letter.

32.     As reflected in the attached Exhibit A, which is a copy of the executed April 2, 2008 Letter Agreement and Schedules A and B later provided to Plaintiff by Barclays, the Schedule B Partnership Undertaking has never been signed by even one Dewey partner, much less the two Dewey partners as both required by Clause 13 of the Letter Agreement and as referenced on the signature page of the Schedule B Partnership Undertaking which stated under the signature blocks for two partners: "Both authorized on behalf of the Firm in accordance with the Bank Mandate."  Instead, the executed Partnership Undertaking attached as Exhibit A was signed only once by Francis J. Canellas, the Finance Director of Dewey in 2008, who was neither an attorney nor a Dewey partner.

33.     At no time did any representative of Barclays ever speak to or otherwise communicate with Plaintiff concerning the April 2, 2008 Letter Agreement or its contents.  In fact, apart from receipt of the April 2, 2008 Letter Agreement, no representative of Barclays ever communicated with by Plaintiff by email, letter, telephone or otherwise at any time about any aspect of the Letter Agreement for over four years, until Plaintiff received a May 17, 2012 Demand Letter from Barclays calling the loan.   Plaintiff was never provided with a copy of the completed loan documentation by anyone at Barclays or Dewey or anyone else until Plaintiff requested a copy of the loan documentation from Barclays in response to their May 17, 2012 Demand Letter.   Plaintiff also was never provided at any time with any statements related to any capital loan taken in Plaintiff's name by Dewey under the Barclays Program, nor was Plaintiff ever provided with any statements concerning the interest amounts due and owing or paid pursuant to any capital loan taken in Plaintiff's name by Dewey, until Plaintiff requested such documentation from Barclays following receipt of the May 17, 2012 Demand Letter.

## DEWEY COLLAPSES

34.     After the October 2007 merger, Dewey, faced with a declining market for legal services caused by the global recession, sought to expand by acquiring lateral partners with significant portable books of business, and sought to retain a select few of existing "rainmakers" within the firm.   Dewey recruited new laterals and retained its existing "rainmakers" by promising both huge guaranteed compensation deals that were, in hindsight, ultimately not sustainable based on the net profits of the firm.  While still remaining fully solvent until filing for voluntary bankruptcy in May 2012 -- for example still posting a $270 million net profit in 2011, the year before its collapse -- Dewey's gross mismanagement and the rampant greed of Dewey's Executive Committee members and other firm insiders ultimately brought the firm down.

35.     The consequences of these poor management decisions and the insatiable greed of Dewey insiders began to be felt immediately by Plaintiff and other similarly situated partners of the firm who were not benefiting from this rampant self-dealing.  In 2008, Plaintiff and many other similarly situated partners only received sixty percent (60%) of their target compensation, while Executive Committee members and other insiders received one hundred percent (100%) or more of their target compensation in 2008 and later years at the expense of the rest of the partnership that was kept in the dark concerning their self-dealing.

## PLAINTIFF NEVER REQUIRED $189,000 IN ADDITIONAL CAPITAL

36.     By the end of 2008, Plaintiff's gross annual compensation dipped to approximately $420,000, a far cry from the $700,000 in target compensation set by the Dewey Executive Committee a year earlier.  Based on Plaintiff's actual 2008 compensation, therefore, Plaintiff's total capital contribution required to be paid to Dewey at the end of 2008 was only thirty-six percent (36%) of $420,000, or a total of approximately $160,000.  Given that Plaintiff's LeBoeuf Capital Account at the end of 2007 was already at approximately $63,000 from prior year deductions, Plaintiff only owed Dewey at most an additional approximately $97,000 in capital at the end of 2008, not the $189,000 reflected in the Letter Agreement.  Under no circumstances did Plaintiff ever owe Dewey as much as $189,000 in additional capital in 2008 or later years.

37.     Over the next three years from 2009 to 2011, Plaintiff's annual gross compensation ranged from $315,000 to $490,000, never exceeding the approximately $490,000 in gross annual compensation Plaintiff was paid in 2011.  Plaintiff's total capital contribution required to be paid to Dewey was only ever at most thirty-six percent (36%) of the $490,000 received in 2011, or a total of approximately $176,000.  Again, given that Plaintiff's LeBoeuf

Capital Account at the end of 2007 was already at $63,000 from prior year deductions, Plaintiff only owed Dewey at most an additional $113,000 in capital at the end of 2011. Again, under no circumstances did Plaintiff ever owe Dewey as much as the $189,000 in additional capital in any year up to and including Plaintiff's resignation from Dewey on May 4, 2012.

### BARCLAY DEMAND LETTERS

38.     As discussed above, Plaintiff's first contact with Barclays in four years since signing the Letter Agreement was receipt of a Demand Letter from Barclays dated May 17, 2012 calling the $189,000 Letter Agreement. After unsuccessful settlement negotiations over the last year, Plaintiff recently received a second Demand Letter from Barclays dated July 22, 2013, after first being threatened over the telephone by a Barclays representative in New York.

### FIRST CLAIM FOR RELIEF

### (FOR DECLARATORY JUDGMENT THAT THE LETTER AGREEMENT IS NOT A VALID OR ENFORCEABLE CONTRACT)

39.     Plaintiff incorporates by reference paragraphs 1 through 38, above, as though fully set forth herein.

40.     Plaintiff's First Claim for Relief seeks a judicial declaration that the Letter Agreement is not a valid or enforceable contract between the parties because there was no acceptance by Plaintiff under Clause 13 of the Letter Agreement. Defendant Barclays claims that the parties entered into a binding contract obligating Plaintiff to pay back $189,000 in principle and additional interest pursuant to the terms of the Letter Agreement. Plaintiff maintains that no binding or enforceable contract was ever accepted by Plaintiff under Clause 13 of the Letter Agreement because as required for there to be acceptance, the Schedule B "Partnership Undertaking" was never signed by at least two Dewey partners. As a result of the

parties' conflicting positions, an actual and justiciable controversy exists over the parties' respective rights and obligations.  This controversy can and should be fully resolved by way of declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

41.    The terms and conditions section of the Letter Agreement includes a Clause 13 entitled "Acceptance," that states (emphasis added): "Acceptance by [Plaintiff] of the Loan on the terms and conditions stated herein will be signified by the [Plaintiff] signing the attached copy of this letter and returning it, together with the Instruction Letter, duly executed, *and the Undertaking, duly signed by authorized partners of [Dewey]*, to the Bank.

42.    The signature page of the Schedule B Partnership Undertaking that is an integral part of the Letter Agreement also includes two separate signature blocks for two different Dewey partners to sign, consistent with the requirement of Clause 13 that acceptance of the Letter Agreement by Plaintiff only occurs upon receipt of the Partnership Undertaking bearing the signature of at least two Dewey partners.  Further, underneath these two separate signature blocks provided for Dewey partners to sign the Schedule B Partnership is the statement: "Both authorized on behalf of the Firm in accordance with the Bank Mandate," again clearly requiring the signature of at least two Dewey partners.

43.    As reflected in Exhibit A to this Complaint, which is a true and correct copy of the executed April 2, 2008 Letter Agreement and Schedules A and B provided by Barclays, the Schedule B Partnership Undertaking was never signed by even one Dewey partner, much less the two partners required by Clause 13 of the Letter Agreement and as referenced on the signature page.  Instead, the Partnership Undertaking was signed, upon information and belief, only once by Francis J. Canellas, the Finance Director of Dewey in 2008, who was neither an attorney nor a Dewey partner at the time or since.

44.    The Letter Agreement should therefore be declared null and void *ab initio* because the "Partnership Undertaking" that is part of the Letter Agreement was never fully executed by two Dewey partners as required by Clause 13 of the Letter Agreement's own express terms governing acceptance of the Letter Agreement by Plaintiff.  Absent signatures by two Dewey partners on the Partnership Undertaking, there was no acceptance of the Letter Agreement by the Plaintiff.

## SECOND CLAIM FOR RELIEF

## (RESCISSION OF LETTER AGREEMENT FOR LACK OF CONSIDERATION)

45.    Plaintiff incorporates by reference paragraphs 1 through 44, above, as though fully set forth herein.

46.    Clause 1 of the Letter Agreement under the heading "Purpose" states: "[t]he Loan is to be used to assist [Plaintiff] with a partnership capital subscription to [Dewey]."

47.    Plaintiff had no need to further fund his capital account in an amount as great as the $189,000 provided for in the Letter Agreement.  At most, Plaintiff only owed Dewey at most an additional approximately $97,000 in capital at the end of 2008, not the $189,000 reflected in the Letter Agreement.  By the end of 2011, Plaintiff only owed Dewey at most $113,000 in total additional capital, not the $189,000 reflected in the Letter Agreement.

48.    The Loan proceeds in any amount were never delivered to Plaintiff.

49.    Plaintiff did not receive adequate consideration in exchange for allegedly being liable for repayment of the $189,000, plus interest, provided for in the Letter Agreement.

50.    Plaintiff is entitled to a declaratory judgment rescinding the Letter Agreement for lack of adequate consideration, or in the alternative, a declaratory judgment reforming the Letter Agreement's terms to reflect the actual amount of additional capital owed by Plaintiff to Dewey.

**THIRD CLAIM FOR RELIEF**

**(RESCISSION OF LETTER AGREEMENT FOR MUTUAL MISTAKE)**

51.    Plaintiff incorporates by reference paragraphs 1 through 50, above, as though fully set forth herein.

52.    At the time that the Letter Agreement was allegedly entered into, both Plaintiff and Barclays were mistaken about the same material fact – that an additional capital contribution of $189,000 was due from Plaintiff to Dewey.

53.    In actuality, at the time that the Letter Agreement was allegedly entered into, no additional capital contribution was due from Plaintiff to Dewey.   Plaintiff only owed Dewey at most an additional approximately $97,000 in capital at the end of 2008, not the $189,000 reflected in the Letter Agreement.   By the end of 2011, Plaintiff only owed Dewey at most $113,000 in total additional capital, not the $189,000 reflected in the Letter Agreement.

54.    The loan proceeds in any amount were never delivered to Plaintiff.

55.    Plaintiff is entitled to a declaratory judgment rescinding the Letter Agreement for mutual mistake, or in the alternative, a declaratory judgment reforming the Letter Agreement's terms to reflect the actual amount of additional capital owed by Plaintiff to Dewey.

**FOURTH CLAIM FOR RELIEF**

**(IN THE ALTERNATIVE)**

**(FOR DECLARATORY JUDGMENT THAT THE LOAN IS NOT DUE AND PAYABLE UNDER ITS REPAYMENT PROVISIONS UNTIL MAY 4, 2022)**

56.    *Assuming Arguendo,* that the Letter Agreement creates a valid or enforceable contract between the parties and should not be rescinded, Plaintiff's Fourth Claim for Relief seeks a judicial declaration that under the express and unambiguous repayment provisions of

Section 5.3(c) of the Letter Agreement, the loan is not due and payable by Plaintiff to Barclays until "120 months after the date upon which [Plaintiff] cease[d] to practice as a partner with the Firm [Dewey]," or on or about May 4, 2022, such date being 120 months after Plaintiff ceased to practice as a Dewey partner on May 4, 2012.  Defendant Barclays claims that Plaintiff must immediately repay the full $189,000 in principle and additional interest.  As a result of the parties' conflicting positions, an actual and justiciable controversy exists over the parties' respective rights and obligations.  This Fourth Claim also can and should be fully resolved by way of declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

57.     The terms and conditions section in the April 2, 2008 Letter Agreement includes a Clause 5 entitled "Repayment."  Clause 5.1 of this Repayment provision provided that "[t]he Borrower shall choose, by manuscript deleting and signing the non-appropriate Clause 5.2 or Clause 5.3 whether to repay the loan on an Amortizing Basis or on a Bullet Repayment Basis." In response, as reflected in the attached Exhibit A, on or about April 11, 2008, Plaintiff deleted Clause 5.2 by crossing through the section with an "X" and signing Plaintiff's initials to the now non-appropriate Clause 5.2.

58.     The remaining "Bullet Repayment" Clause 5.3(c) of the April 2, 2008 letter that was not deleted by Plaintiff provided, in relevant part (emphasis added):

> In the event of: (a) the Borrower ceasing to practice as a partner with the Firm including by reason of the death of [Plaintiff]; and (b) the provisions of Article X of the Firm's Partnership Agreement preventing immediate repayment of the Borrower's partnership capital, the Loan shall become due and payable at the times and in such amounts as the Borrower's capital account is repaid in accordance with the Firm's partnership Agreement (as in effect at date of this agreement) *and in any event no later than the date falling 120 months after the date upon which the Borrower ceases to practice as a partner with the Firm.*

59.     Plaintiff resigned from Dewey on May 4, 2012, thereby "ceas[ing] to practice as a partner within the Firm" under Section 5.3(c)(a) of the Letter Agreement.

60.     Section X of Dewey's Partnership Agreement referred to above in the Clause 5.3(c)(b) of the Letter Agreement provided that the sums standing to the credit of a partner's Capital Account with the firm would be repayable within three years following the partner ceasing to be a partner in the Firm, whether by reason of death, retirement or otherwise.  At the time of Plaintiff's resignation from Dewey on May 4, 2012, Section X of the Dewey Partnership Agreement "prevent[ed] immediate repayment of the [Plaintiff's] partnership capital," thereby making the Loan under the express terms of Clause 5.3(c)(b) (emphasis added) of the Letter Agreement "due and payable at the times and in such amounts as the [Plaintiff's] capital account is repaid in accordance with the Firm's partnership Agreement (as in effect at date of this agreement) *and in any event no later than the date falling 120 months after the date upon which the [Plaintiff] ceases to practice as a partner with the Firm*."

61.     Dewey declared bankruptcy on or about May 28, 2012, precluding Plaintiff's capital account from ever being repaid "at the times and in such amounts" in accordance with Section X of Dewey's Partnership Agreement.

62.     Plaintiff therefore both ceased to practice as a Dewey partner on May 4, 2012, and as a result of the Dewey bankruptcy will never be repaid his capital "at the times and in such amounts" in accordance with Section X, thereby requiring under the express and unambiguous terms of the Repayment provision Clause 5.3(c)(b) of the Letter Agreement that the loan now become due and payable "no later than the date falling 120 months after the date upon which [Plaintiff] ceases to practice as a partner with [Dewey]."  That date for repayment of the Loan is no later than May 4, 2022.

63.     Thus, the Court should enter a judgment declaring that the $189,000 loan provided for in the Letter Agreement is not due and payable until May 4, 2022.

## RELIEF REQUESTED

WHEREFORE Plaintiff respectfully requests that the Court grant the following relief:

(a)  On the First Claim for Relief, a judgment declaring that the Letter Agreement is invalid and unenforceable;

(b)  On the Second Claim for Relief, rescinding the Letter Agreement for lack of consideration, or alternatively, a declaratory judgment reforming the Letter Agreement's terms to reflect the actual amount of additional capital owed by Plaintiff to Dewey;

(c)  On the Third Claim for Relief, a judgment rescinding the Letter Agreement for mutual mistake, or alternatively, a declaratory judgment reforming the Letter Agreement's terms to reflect  the actual amount of additional capital owed by Plaintiff to Dewey;

(d)  On the Fourth Claim for Relief, a judgment declaring that the Letter Agreement is not due and payable until May 4, 2022;

(e)  An award to Plaintiff of the costs and disbursements of this action;

(f)  Such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by Jury.

Dated: August 8, 2013

By: _____

Geoffrey H. Coll, *pro se*

S.D.N.Y. Bar No. 2020

901 K Street NW
Suite 700
Washington, DC 20001
Telephone: (202) 778-6432
Facsimile: (202) 778-6460

- 19 -

Exhibit A



**BARCLAYS COMMERCIAL**

Professional Services
Barclays Commercial Bank
Level 27
1 Churchill Place
London
E14 5HP

Tel +44 (0)20 7116 1000
Fax +44 (0)20 7116 7621

www.barclayscommercial.com

02 April 2008

Mr Geoffrey Coll
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY
10019-6092
USA

Our Ref: SM

Dear Mr Coll

We are pleased to advise you that Barclays Bank PLC (the "Bank") has agreed to provide a loan (the "Loan" which expression, where the context so admits, means the outstanding amount thereof for the time being) of US$189,000.00 (One hundred and eighty nine thousand US dollars) to Geoffrey Coll(the "Borrower") subject to the following terms and conditions.

The Schedules attached hereto form part of the terms and conditions of this letter.

1.     **Purpose**

       The Loan is to be used to assist the Borrower with a partnership capital subscription to Dewey & LeBoeuf LLP (the "Firm").

2.     **Offer Period**

       This offer will be available to the Borrower for acceptance for a period of two calendar months from the date of this letter, after which date the offer will lapse.  Acceptance will be signified by completion of the formalities in clause 13.

3.     **Drawdown**

3.1    Following completion of the matters detailed in clause 8 and the acceptance formalities detailed in clause 13, the Loan will be available for drawing in a single amount within three calendar months of the date of this letter (at which date the Bank's commitment to provide the Loan shall lapse).

3.2    The Borrower agrees that any amount drawn will be credited to an account in the name of the Firm.

4.     **Interest**

       a.     Interest on the Loan will consist of the aggregate of the Bank's margin of 1% per annum and the Bank's Base Rate for US dollars current from time to time and will be calculated on the basis of actual days elapsed over a 360 day year and will be payable quarterly in arrears on behalf of the Borrower (without any deduction, set-off or counterclaim) on the Bank's usual charging dates in March, June, September and December each year.

       b.     If the sterling equivalent of the Loan exceeds £25,000, the Bank reserves the right to increase the margin over Base Rate in the event that the cost to the Bank of maintaining the Loan is increased as a result of changes in law or regulations by the Bank of England or other Governmental authorities (whether having the force of law or otherwise) to cover such increased costs.

Barclays Bank PLC. Authorised and regulated by the Financial Services Authority.
Registered in England. Registered No. 1026167. Registered Office: 1 Churchill Place, London E14 5HP.

    c.    Interest shall, unless otherwise mutually agreed, be debited to a designated current account maintained by the Firm with the Bank (account number 54083200, sort code 20-00-00).

    d.    Interest which is not paid on the due date will be compounded and interest will be charged both before and after any demand.

    e.    All determinations made by the Bank for the purpose of this clause shall be conclusive except in the case of manifest error.

**5.**    **Repayment**

5.1    The Borrower shall choose, by manuscript deleting and signing the non appropriate Clause 5.2 or Clause 5.3 whether to repay the Loan on an Amortising Basis or on a Bullet Repayment Basis In the event that the Borrower falls to delete one of the said clauses and sign the deletion, the Loan shall be repaid on a Bullet Repayment Basis.

5.2    If the Amortising Basis applies:

    (a)  The Loan shall be repaid by 51 consecutive quarterly instalments of US$3,634.62 and a final instalment of US$3,634.38, commencing 24 months from the date of drawdown. If the Loan is not fully drawn, the repayments will be reduced pro rata.

    (b)  In the event of: (a) the Borrower ceasing to practice as a partner with the Firm including by reason of the death of the Borrower; and (b) the provisions of Article X of the Firm's Partnership Agreement preventing immediate repayment of the Borrower's partnership capital, the Loan shall become due and payable at the times and in such amounts as the Borrower's capital account is repaid in accordance with the Firm's Partnership Agreement (as in effect at date of this Agreement) and in any event no later than the repayment schedule set out in clause 5.2(a) above.

5.3    If the Bullet Repayment Basis applies:

    (a)  Subject to clause 5.3(b), the Loan shall be repaid in full no later than the fifth anniversary of drawdown (the "Repayment Date").

    (b)  Shortly before the first anniversary of the acceptance of this offer and annually thereafter: (i) the borrower shall be deemed to request that the Repayment Date be extended by a year, unless the Borrower notifies the Bank in writing otherwise, and (ii) the Bank shall, at its absolute discretion, either extend the Repayment Date by a year or notify the Borrower in writing of any decision not so to extend.

    (c)  In the event of: (a) the Borrower ceasing to practice as a partner with the Firm including by reason of the death of the Borrower; and (b) the provisions of Article X of the Firm's Partnership Agreement preventing immediate repayment of the Borrower's partnership capital, the Loan shall become due and payable at the times and in such amounts as the Borrower's capital account is repaid in accordance with the Firm's Partnership Agreement (as in effect at date of this Agreement) and in any event no later than the date falling 120 months after the date upon which the Borrower ceases to practice as a partner with the Firm.

**6.**    **Prepayment**

The Loan may be prepaid in whole or in part at any time without penalty. Any amounts prepaid will not be available for redrawing.

**7.**    **Agency**

By its acceptance of this letter, the Borrower appoints as its agent, and grants power of attorney to, [the finance partner] from time to time of the Firm (the "Agent") to sign all documents and do all acts on the Borrower's behalf in connection with drawing the Loan, paying interest on the Loan and repaying the Loan.

8.    **Collateral**

The Loan will be collateralised by the Borrower executing the letter of instruction that forms Schedule A, (the "Instruction Letter") and the Firm executing the undertaking that forms Schedule B, (the "Undertaking")

9.    **Undertakings**

The Borrower undertakes that whilst any part of the Loan is outstanding:

a.    The Borrower will inform the Bank, promptly on becoming aware of it, of (i) any breach by the Borrower in the performance of any terms or conditions of this agreement or (ii) the occurrence of any of the circumstances referred to in clause 10.1.

b.    The Borrower will promptly provide the Bank with any financial information relating to the Borrower which is in existence and is in the possession and control of the Borrower, which the Bank may request from time to time.

10.   **Events of Default**

10.1   In the event of:

a.    failure by the Borrower, or the Agent, to make any repayment of principal, or payment of interest or other monies, in respect of the Loan on its due date unless the Borrower demonstrates that the failure to pay is solely due to a technical or administrative failure and the relevant amount is duly paid within 3 business days after the due date; or

b.    a breach in the performance of any other term or condition of the Loan; or

c.    the presentation of a bankruptcy petition against, or the application for an order in respect of, or the insolvency, or the mental disorder, of the Borrower and in any such event such process is not discharged, stayed, withdrawn or vacated before the 30th day after receipt by the Borrower of such process; or

d.    the Borrower entering into a composition with the Borrower's creditors; or

e.    a distress, execution or other legal process being levied against any of the assets of the Borrower, either jointly or alone and in any such event such process is not discharged, stayed, withdrawn or vacated before the 30th day after receipt by the Borrower of such process; or

f.    any indebtedness in excess of US$25,000 of the Borrower becoming immediately due and payable, or capable of being declared so due and payable, prior to its stated maturity, by reason of default on the part of any person; or

g.    the Borrower failing to discharge any indebtedness in excess of US$25,000 on its due date; or

h.    the balance standing to the credit of the Borrower's capital account with the Firm reducing to a sum below the amount of the Loan; or

i.    the statement made in paragraph (ix) of the Undertaking being untrue in any respect; or

j.    in the event of any indebtedness of the Firm in excess of US$250,000 becoming immediately due and payable, or capable of being declared so due and payable, prior to its stated maturity, by reason of default on the part of any person

then the Bank may, at any time while any such event continues unremedied or unwaived, serve written notice on the Borrower declaring that the Bank's commitment to advance the Loan or any balance thereof shall cease and/or demand repayment of the whole amount of the outstanding Loan and all accrued interest and other amounts owing hereunder will become repayable forthwith on demand in writing made by the Bank at any time and/or place the Loan on demand.

10.2    Any monies not paid following a demand under this clause shall continue to bear interest until paid before as well as after judgement. Interest will only be charged on such monies in accordance with clause 4 except that, if the sterling equivalent of the Loan exceeds £25,000, the Bank's margin as detailed in clause 4a shall be increased by 1% per annum.

10.3    Notwithstanding any provision of any document to which the bank is a party, the Bank will not demand repayment of the Loan except in accordance with this clause and clause 5.

10.4    The Borrower shall indemnify the Bank on demand against any loss, liability, cost or expense that the Bank may reasonably sustain or incur as a consequence of making such demand or as a consequence of non-performance by the Borrower of any obligation under this letter.

10.5    No delay or omission on the part of the Bank in exercising any right or power under the terms of the Loan in accordance with this clause shall impair such right or power, and any single or partial exercise thereof shall not preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Bank in respect of the Loan are cumulative and not exclusive of any right or remedy provided by law.

11.    <u>Governing Law</u>

11.1    This facility letter shall be governed by and construed in accordance with the laws of England.

11.2    In the event that the Bank files an action before the English courts to enforce the terms of the Loan, the Borrower hereby irrevocably submits to the personal jurisdiction of the English courts, and irrevocably waives any objection to such jurisdiction or inconvenient forum.

11.3    Any process or summons to be served upon the Borrower in an action before the English courts may be served by sending a copy thereof by post to: Dewey & LeBoeuf LLP One London Wall London EC2Y 5EZ. Such mailing shall be deemed personal service and shall be legal and binding upon the Borrower.

11.4    In the event the Bank seeks to enforce any judgment obtained in connection with the terms of the Loan in any state or federal court sitting in New York, either under the Uniform Foreign Country Money-Judgments Recognition Act, N.Y. C.P.L.R. §§ 5301-5309, or through any other recognition and/or enforcement proceeding, the Borrower hereby irrevocably submits to the jurisdiction of New York for purposes of such an enforcement proceeding, and irrevocably waives any objection, including on grounds of inconvenience, to such jurisdiction or forum. The Borrower hereby waives any right under CPLR § 5306 or otherwise to seek a stay of an action to enforce an English judgment obtained in connection with this letter, the Instruction Letter and/or the Undertaking.

12.   **Definitions**

In this letter:

"sterling" means the lawful currency for the time being of the United Kingdom;

the "sterling equivalent" at any time of an amount of US dollars means the amount of sterling which could be purchased with that amount of US dollars at the spot rate of exchange quoted by the Bank at that time for the purchase of sterling with US dollars; and

"US dollars" means the lawful currency for the time being of the United States of America.

13.   **Acceptance**

Acceptance by the Borrower of the Loan on the terms and conditions stated herein will be signified by the Borrower signing the attached copy of this letter and returning it, together with the Instruction Letter, duly executed, and the Undertaking, duly signed by authorised partners of the Firm, to the Bank.

14.   **Disclosure of Information**

The Bank may disclose to the Firm the amount of the Loan and/or any increase in or repayment or prepayment of all or part of the Loan upon request by the Firm, at any time and from time to time.

15.   **Entire and Binding Agreement**

This letter, the Instruction Letter and the Undertaking contain the entire agreement between the parties with respect to the transactions contemplated hereby, and supersedes all written or oral negotiations, representations, warranties, and other understandings prior to the date hereof, except as expressly confirmed or provided herein. The terms of this facility letter may not be amended except in writing.

Yours sincerely
for and on behalf of
**BARCLAYS BANK PLC**

**IAIN WORSLEY
RELATIONSHIP DIRECTOR**

Accepted on the terms and conditions as stated above.

Signed and delivered as a deed by

**Geoffrey Coll
BORROWER**
In the presence of

**SIGNATURE OF WITNESS**

Date: 4 . 11 . 08

## SCHEDULE A

## INSTRUCTION LETTER

To: Dewey & LeBoeuf LLP
        (the "Firm")

FAO: Peter Casey

02 April 2008

Dear Sirs,

I confirm that I have applied to Barclays Bank PLC (the "Bank") to borrow for the purpose of injecting capital into the Firm, and that I may in the future make further such applications.

In order for the Bank to authorise such borrowings the Bank requires that the Firm issue a Letter of Undertaking under which, *inter alia*, the Firm will undertake to pay any funds withdrawn at any time (and from time to time) on or after the date hereof from my partnership capital account with the Firm (the "Capital Account") directly to the Bank for application in or towards repayment of such borrowings to the extent necessary to repay such borrowings and to ensure that the outstanding balance of such borrowings shall not at any time exceed the balance of the Capital Account.

I hereby request the Firm to issue the Letter of Undertaking in such form as may be required by the Bank and agreed by the Firm, and I confirm that I instruct the Firm irrevocably (unless the Bank should consent in writing to the cancellation of such instruction) to apply any funds withdrawn from time to time from the Capital Account in payment directly to the Bank to the extent required by the terms of such Letter of Undertaking.

I submit to the jurisdiction of the courts of England. This Letter shall be governed by the laws of England.

Yours faithfully,

Geoffrey Coll

**SCHEDULE B**

<u>**PARTNERSHIP UNDERTAKING (the "Undertaking")**</u>

Dear Sirs

**LOAN(S) TO:** Geoffrey Coll (the "Partner")

**INITIAL AMOUNT:** US$189,000.00

**LETTER OF INSTRUCTION DATED**                              (the "Instruction Letter")

Dewey & LeBoeuf LLP   (the "Firm")

We confirm that on receipt of any amount provided by Barclays Bank PLC (the "Bank") to the Partner by means of a partnership capital subscription loan (each a "Loan") pursuant to a partnership capital subscription loan facility letter from the Bank to the Partner (the "Facility Letter"), such amount will be placed to the credit of the Partner's partnership capital account (the "Capital Account") in the Firm's books.

We acknowledge receipt of a copy of:

i.      the Facility Letter; and

ii.     a letter under which the Partner has irrevocably instructed the Firm (unless the Bank should consent in writing to the cancellation of such instruction) to apply any funds withdrawn at any time (and from time to time) on or after the date hereof from the Capital Account in payment directly to the Bank to the extent required by the terms of this Undertaking (the "Instruction Letter") and we confirm that we have not received any prior notice of any other assignment of such funds.

In connection with each Loan:

i.      we confirm that under the partnership agreement between all the partners in the Firm (the "Partnership Agreement"), the sums standing to the credit of the Partner's Capital Account with the Firm shall be repayable within 3 years (subject to Article X of the Partnership Agreement) following the Partner ceasing to be a partner in the Firm, whether by reason of death, retirement or otherwise;

ii.     provided that the Instruction Letter remains in force, we irrevocably undertake that upon the earliest of: (a) the Partner ceasing to be a Partner in the Firm, (b) the occurrence of any event of default under the Facility Letter, and (c) the making or docketing of judgment in England or New York against the Partner in respect of amounts due under the Facility Letter, we will apply the balance of the Partner's Capital Account in satisfying (so far as is possible) any indebtedness remaining outstanding under the Loan with the Bank, before paying any residue to the Partner or to the Partner's legal personal representatives;

iii.    we will procure that no change shall be made to the Partnership Agreement if such change might affect the validity of the confirmations given in this Undertaking;

iv.     we confirm that until such time as the Partner ceases to be a partner in the Firm, the amount standing to the credit of the Partner's Capital Account with the Firm will not be permitted to be reduced without the Bank's consent except only that the Firm shall be entitled to debit to such Capital Account the Partner's share of any trading loss sustained by the Firm to the extent that such loss cannot be made good out of the Partner's share of any undistributed profits;

v.      we confirm that no rights of set-off over the Partner's Capital Account shall be exercised in preference to the Bank;

vi.     we confirm that we will advise you immediately should the balance of the Partner's Capital Account fall below the amount of the Loan;

vii.    we confirm that we will provide the Bank with any financial information relating to the Firm which the Bank may reasonably request from time to time;

viii.   we agree that interest on the Loan can be debited to a designated current account maintained by the Firm with the Bank (account number 54083200, sort code 20-00-00);

ix.     we confirm that (a) we have the power to enter into and perform our obligations under this Undertaking, (b) we have taken all necessary action to authorise our entry into and performance of our obligations under this Undertaking, and (c) this Undertaking constitutes our legal, valid binding and enforceable obligations; and

x.      we shall procure that the provisions of the Partnership Agreement (including without limitation Article X) relating to return of capital, shall not be amended without the Bank's prior written consent.

It is understood that if the Partner's Capital Account falls below the amount of the Loan the Loan may become repayable on demand and the Bank shall be entitled to re-negotiate the terms of the Loan and/or to request that the Partner provide the Bank with additional security, or demand full repayment of the Loan.

Yours faithfully

PARTNER                                  PARTNER

Both authorised on behalf of the Firm in accordance with the Bank Mandate.

Date: